# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **RYAN J. BROUSSARD** | * | **CIVIL ACTION NO. 05-1041** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Ryan J. Broussard, born October 1, 1982, filed applications for disability insurance benefits and supplemental security income payments on June 3, 2003, alleging disability as of May 13, 2003, due to a fracture to his neck at C-6, a broken left foot, a crushed nose, inability to stand on his left foot, and inability to turn his head due to a motor vehicle accident.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Lafayette General Medical Center dated May 14-30, 2003**. On May 14, 2003, claimant was admitted to the emergency room after being involved in a motor vehicle accident while intoxicated. (Tr. 113, 128, 134). He had multiple facial injuries, a broken foot, a possible head injury, a possible cervical injury, and blunt chest trauma. (Tr. 111). A CT scan showed a nasal bone fracture and a minimally displaced left ZMC fracture. (Tr. 134). Left foot x-rays revealed a comminuted cuboid fracture and a second metatarsal neck fracture. (Tr. 136). An arc aortogram revealed no evidence of traumatic vascular injury. (Tr. 140).

**(2) Records from Dr. Jeffrey Joseph dated May 14, 2003 to June 2, 2003**. On May 14, 2003, Dr. Jeffrey Joseph performed an open reduction and internal fixation of the left ZMC fracture with orbital blow-out, and a closed reduction of the nasal fracture. (Tr. 138). Claimant's lacerations were healing appropriately on May 29, 2003. (Tr. 154). On June 2, 2003, his lateral eye movement had improved and he was "doing well." (Tr. 153).

**(3) Physical Residual Functional Capacity ("RFC") Assessment dated July 15, 2003**. S. Stevens, SSA 2, determined that claimant could lift 20 pounds

occasionally and 10 pounds frequently. (Tr. 162). He could stand, walk, and sit about 6 hours in an 8-hour workday. He had unlimited push/pull ability. He had occasional postural limitations. (Tr. 163).

**(4) Records from Dr. Joseph dated July 22, 2003 to December 11, 2003.** On July 22, 2003, claimant complained of swelling over the left medial infra orbital rim, right-sided hearing loss, and nasal obstruction. (Tr. 180). Dr. Joseph aspirated a mass below the orbital rim, and prescribed Augmentin. On July 29, Dr. Joseph reported that claimant's hearing was normal by audio, and that his orbital infection had resolved. (Tr. 179).

On November 26, 2003, claimant complained of some swelling of the left orbit. (Tr. 176). The fluid accumulation was aspirated and relieved on December 1, 2003. (Tr. 173). A CT scan showed some stenosis of the OMCs, but no apparent fractures. (Tr. 170). Dr. Joseph discussed performing a DCR endoscopically, and proceeding with ethmoidectomy and maxillary sinus surgery on the left. Following that, he recommended rhinoplasty.

**(5) Records from Dr. Alan J. Appley dated June 25, 2003 and August 25, 2003.** On June 25, 2003, Dr. Appley reported that claimant was six weeks post-accident with multi-trauma and a moderate closed head injury, and a superior body compression fracture at C5. (Tr. 185). X-rays dated August 20, 2003, showed

3

straightening of the cervical spine with mild compression at C5 and C6. Dr. Appley stated that claimant's alignment was normal, and that his fractures were healed at that point. Claimant had atrophy in the bilateral trapezius, levator scapulae, and possibly pectoralis. Dr. Appley recommended an MRI and electrodiagnostic testing of the upper extremities.

**(6) Records from Dr. Samir A. Salama dated July 17, 2003 to December 9, 2003**.[1] On July 17, 2003, Dr. Salama, a psychiatrist, diagnosed claimant with bipolar disorder and depression. (Tr. 186-91). Claimant was prescribed medications.

On August 26, claimant reported that he was doing better, was calmer, and was not depressed. (Tr. 190). Claimant's mother reported that he was doing well with no further anger episodes. Claimant had no side effects from his medications.

**(7) Records from Lafayette General Hospital dated June 18, 2003 to August 7, 2003**. X-rays of the left foot dated July 10, 2003, showed some progression of healing of the second metatarsal fracture. (Tr. 196). Claimant had good range of motion of the ankle. (Tr. 194). On August 7, 2003, claimant was instructed that he could gradually return to sports. (Tr. 193).

**(8) Consultative Neurological Examination by Dr. Ross Klingsberg dated July 10, 2004**. Claimant presented with a chief complaint of shoulder pain and a

---

[1] These records are barely legible.

history of bipolar disorder. (Tr. 198). He also stated that he had some left foot pain and decreased arm strength. He was able to dress and feed himself, stand for 4 hours during an 8-hour shift, walk for 2 blocks, sit for 1 hour, lift 2 to 5 pounds, and help with shopping and dusting. His medications were Depakote and Zoloft.

On examination, claimant was 72 inches tall and weighed 163 pounds. (Tr. 199). He was able to ambulate and get up and out of a chair and onto and off of the exam table without difficulty. He had normal hearing. His vision was 20/25 bilaterally with glasses.

Claimant had normal pulses in all extremities. He had no muscle atrophy. Range of motion was normal in the shoulders. He rested with his shoulders somewhat pronated, but was able to correct this with appropriate effort. (Tr. 200). He had some atrophy of the trapezius muscles. Testing did not indicate any evidence of winging in the scapula.

Neurologically, claimant answered questions appropriately throughout the examination. He had no sign of mental instability. He had 5/5 motor strength in all extremities. He had some minimal atrophy of the trapezium muscle bilaterally.

On sensory examination, claimant had no tremor or nystagmus. Cranial nerves revealed normal visual acuity. Sensation was subjectively decreased on the right side of the face. He had no facial asymmetry. Cranial nerves and facial muscles were

intact. Hearing was normal. Shoulder shrug was symmetrical. Deep tendon reflexes were symmetric and non-pathological.

Dr. Klingsberg's impressions were shoulder pain with no evidence of structural damage, left foot pain from a fracture in the cuboid bone, and poor posture of the shoulders which was a consequence of decreased muscle tone. He reported that claimant's shoulder pain and posture would be expected to improve with appropriate muscle strengthening exercises and physical activity. He stated that the foot pain should improve with appropriate medical care. Dr. Klingsberg opined that claimant had a preserved capacity to sit, stand, and walk, as well as to lift, hear, speak, and handle objects. (Tr. 201).

In the Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Klingsberg opined that claimant's ability to lift/carry, stand/walk, sit, and push/pull were not affected by his impairment. (Tr. 202-03). He could frequently perform all postural activities. (Tr. 203). He had unlimited manipulative and visual/communicative functions. (Tr. 204). He had no environmental limitations. (Tr. 205).

**(9) Consultative Mental Status Exam by Carla C. Adams, Ph.D, dated July 28, 2004**. Claimant complained that since his car accident in May, 2003, he had become easily depressed, suicidal, homicidal, and easily agitated with people. (Tr.

6

206). He stated that he had seen Dr. Salama, who had prescribed Zoloft and Depakote. He reported that the medications made him calmer, and that he was easily agitated and explosive without them.

Claimant reported that he had fought a great deal with his peers. (Tr. 207). He stated that he had three arrests relating to simple battery, possession of marijuana, and careless operation. He also described an arrest in which he had argued with a policeman at a Mardi Gras parade. He stated that he had stopped drinking and using marijuana and cocaine. He reported some memory problems following the car accident.

On examination, claimant was alert and oriented as to time, person, and place. He had no unusual thought processes, thought content, or perceptual abnormalities. His affect was appropriate. He did not report any current suicidal ideation or intent, but did describe becoming easily agitated with others. His attention was adequate, and memory was fair.

Dr. Adams' impression was that claimant had reported what appeared to be significant alcohol and drug abuse prior to a car accident in which he had sustained numerous physical injuries. (Tr. 208). She opined that he appeared to have stabilized somewhat, and had not used drugs since December, 2003 or alcohol since February, 2004. She observed that Dr. Salama's diagnosis of bipolar disorder was accurate,

7

with symptoms likely exacerbated by alcohol and drug use. Her diagnostic impression was bipolar disorder, and alcohol and marijuana abuse, reported in remission. She stated that claimant appeared to have the capacity to manage funds independently.

In the Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Adams opined that claimant had slight limitations as to his ability to understand, remember, and carry out detailed instructions. (Tr. 209). She also found that he had a slight limitation as to his ability to make judgments on simple work-related decisions.

**(10) Claimant's Administrative Hearing Testimony**. At the hearing on May 17, 2004, claimant testified that he was seeing Dr. Appley and Dr. Joseph. (Tr. 218). He stated that he was waiting to get a nerve conduction study and facial surgeries, but did not have any money. He complained that he could not lift, participate in sports, ride four-wheelers, or work anymore. (Tr. 219). He said that he had blurred vision, so he did not drive anymore.

Claimant testified that he was still seeing Dr. Salama. (Tr. 220). He reported that he went every three months. He stated that his mother was paying those bills.

**(11) Administrative Hearing Testimony by Claimant's Mother, Janice Broussard**. Mrs. Broussard testified that claimant was "severely bipolar." (Tr. 220).

8

She stated that he had become worse since the car wreck. (Tr. 221). She reported that he was on Zoloft and Depakote.

Additionally, claimant's mother testified that claimant's shoulders "rounded in," and he could not rotate his arms without force. (Tr. 222). She stated that he could not lift a cast iron skillet. She said that he struggled to cut a steak. (Tr. 223). She also reported that his vision was getting worse. (Tr. 224).

**(12) The ALJ's findings are entitled to deference**. Claimant argues that: (1) the ALJ's finding of non-disability was arbitrary and was unsupported by the medical evidence; (2) the ALJ's findings that the claimant's allegations regarding his limitations are not totally credible were arbitrary and unsupported by the medical evidence, and (3) the ALJ improperly found that a job existed in sufficiently significant numbers in the state and national economies that claimant can perform.

As to the first argument, claimant asserts that the ALJ erred in finding medical improvement. (rec. doc. 6, pp. 3, 6). However, medical improvement initially requires a determination of disability, which did not occur in this case. *See* 20 C.F.R. § 1594(b)(1) ("Medical improvement is any decrease in the medical severity of your impairment(s) *which was present at the time of the most recent favorable medical decision* that you were disabled or continued to be disabled.") (emphasis added). Thus, this argument lacks merit.

9

Claimant also argues that his condition has deteriorated, not improved, because his shoulders have bowed and his eyesight has blurred since the accident. (rec. doc. 6, p. 6). However, Dr. Klingsberg noted that while claimant rested with his shoulders somewhat pronated, he was able to correct this with appropriate effort. (Tr. 200). Additionally, he determined that claimant's vision with glasses was 20/25 bilaterally. (Tr. 199). Further, claimant's treating physician, Dr. Joseph, found that claimant's lateral eye movement had improved and that he was "doing well." (Tr. 153). It is well established that appellant's subjective complaints must be corroborated at least in part by objective medical testimony. *Houston v. Sullivan* 895 F.2d 1012, 1016 (5th Cir. 1989) (citing *Harrell v. Bowen,* 862 F.2d 471, 481 (5th Cir.1988)). That is not the case here. Thus, this argument lacks merit.

Additionally, claimant alleged a disabling mental impairment. (Tr. 221). The record reflects that Dr. Salama diagnosed claimant with bipolar disorder, for which he prescribed medication. (Tr. 189). Subsequently, claimant reported that he was doing better and had no side effects from the medicines. (Tr. 190). Claimant also informed Dr. Adams that he had improved with medication. (Tr. 206). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Next, claimant argues that he could not afford further medical treatment. (rec. doc. 6, p. 7; Tr. 218). In the Fifth Circuit, the rule is that if the claimant cannot afford the prescribed medical treatment or medicine, *and can find no way to obtain it*, the condition that is disabling in fact continues to be disabling in law. (emphasis added). *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). In this case, the record reflects that claimant has been treated at University Medical Center, which is a facility for indigent patients. (Tr. 76-108). Thus, he has found a way to obtain necessary medical treatment. Additionally, he has not shown that his condition "is disabling in fact." The *Lovelace* rule does not encompass claims of persons who can prove no disability but only seek benefits as a means of affording care that might conceivably prevent a disability. *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989). Accordingly, this argument is meritless.

Finally, claimant argues that the ALJ failed to identify substantial available work. (rec. doc. 6, p. 7). The ALJ concluded that claimant could perform the full range of light work. (Tr. 19-20). This finding is supported by the Medical Source Statement of Dr. Klingsberg, who determined that claimant had no exertional, postural, manipulative, visual/communicative, or environmental limitations. (Tr. 202-05). Additionally, the state agency examiner found that claimant could lift 20 pounds occasionally and 10 pounds frequently; could stand, walk, and sit about 6 hours in an

8-hour workday; had unlimited push/pull ability, and had occasional postural limitations. (Tr. 162-63).

If impairments are solely exertional or the non-exertional impairments do not sufficiently affect the claimant's residual functional capacity, then the Commissioner may rely exclusively on the Grids to determine whether there is other work in the economy that the claimant can perform. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). Here, the ALJ determined that claimant's non-exertional impairments did not significantly affect his residual functional capacity. (Tr. 16-18). He found that claimant met Rule 202.18 of the Medical-Vocational Guidelines, which directs a finding of not disabled for a claimant who is a younger individual with limited or less education and with previous work experience at skilled or semiskilled job.[2] (Tr. 19). 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.18. As the claimant meets these criteria, the ALJ's reliance on the Medical-Vocational Guidelines is entitled to deference.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

---

[2]Claimant reported to Dr. Adams that he had past work experience as a crane operator, deck hand, and well tester helper. (Tr. 207).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Signed this 29th day of March, 2006, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE